**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Hector H.A.,

Petitioner,

v.

Todd Blanche, *Acting Attorney General*; Markwayne Mullin; *Secretary, U.S. Department of Homeland Security*; David J. Venturella, *Acting Director of Immigration and Customs Enforcement*; David Easterwood, *Acting Director, St. Paul Field Office Immigration Customs Enforcement*; and Ryan Shea, *Sheriff of Freeborn County*,

Respondents.

Case No. 26-cv-02914 (KMM/ECW)

**REPORT AND RECOMMENDATION**

---

This matter is before the Court on Petitioner Hector H.A.'s[1] Verified Petition for Writ of Habeas Corpus, filed on June 10, 2026. (Dkt. 1.) This case has been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the following reasons, this Court recommends that the Petition for Writ of Habeas Corpus (Dkt. 1) be granted.

---

[1] This District has adopted a policy of using only the first name and last initial of any nongovernmental parties in orders and report and recommendations in immigration matters.

## I. BACKGROUND

Petitioner is a citizen of Honduras. (Dkt. 1 ¶ 7; Dkt. 6 ¶ 8.) The Petition alleges, and Respondents (also referred to as "the Government") do not dispute, that in Honduras, Petitioner faced constant threats from gangs and feared for his life. (Dkt. 1 ¶ 16.) Petitioner traveled to the United States in late 2022, after his father died. (*Id.*) He was seventeen years old at the time and was not accompanied by an adult family member. (*Id.*; Dkt. 9-1 ¶ 4.)

Petitioner encountered immigration authorities at the southern border, and on December 9, 2022, Customs and Border Protection ("CBP") conducted an unaccompanied-alien-child ("UAC") screening. (Dkt. 9-1 ¶ 5; *see also* Dkt. 9-2 at 9-11.) Petitioner informed CPB that he feared persecution or torture if he returned to Honduras. (Dkt. 9-2 at 15.) After completing the screening, CPB served Petitioner on December 9, 2022 with a Form I-200 Warrant for Arrest. (Dkt. 9-1 ¶ 6, Dkt. 9-2 at 5.) The warrant states that Petitioner was "liable to being taken into custody as authorized by section 236 of the Immigration and Nationality Act." (Dkt. 9-2 at 5.)

Petitioner was then taken into the custody of Health and Human Services Office of Refugee Resettlement ("HHS ORR"). (Dkt. 9-1 ¶¶ 5-7.) HHS ORR then placed Petitioner at the Southwest Key Casa Padre, which at the time was a shelter for unaccompanied immigrant minors in the custody of HHS ORR. (*Id.* ¶ 7.) Petitioner remained in custody at that facility until December 18, 2022. (*Id.*) Petitioner was then released on an order of recognizance to the custody of his sister, who resided in Iowa. (*Id.* ¶¶ 8-9, 10.)

On January 25, 2023, the Department of Homeland Security ("DHS") issued a Notice to Appear, which was mailed to Petitioner at his sister's address in Iowa. (Dkt. 9-2 at 1.) The notice stated that Petitioner was subject to removal from the United States pursuant to section "212(a)(6)(A)(i) of the Immigration and Nationality Act, as amended, in that [he is] an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General." (*Id.*) The notice ordered Petitioner to appear before an immigration judge in Omaha, Nebraska over two years later, on September 11, 2025.[2] (*Id.*)

Petitioner continued to reside in Iowa as he awaited his immigration court date and applied for asylum. (*See* Dkt. 1 ¶¶ 16-17.) The Petition asserts, and Respondents do not dispute, that Petitioner "is a young man who loves to cook, is not dangerous in any way, and is trying to make a better life for himself away from the dangers of gang violence." (*Id.* ¶ 19.) Other then traffic violations, Petitioner has no criminal history. (*Id.* ¶ 18; *see also* Dkt. 6-2 at 3.)

On December 25, 2025, Petitioner was pulled over by local police in Iowa for a traffic related violation. (Dkt. 1 ¶ 17; Dkt. 5 at 1; Dkt. 6 ¶ 11; Dkt. 6-2 at 3.) Petitioner was briefly taken into state custody at the Polk County Jail. (Dkt. 9-1 ¶ 11.) Immigration and Customs Enforcement ("ICE") logged an I-247A Immigration Detainer with the jail

---

[2] No party has indicated whether the September 11, 2025 hearing took place. Petitioner has asserted, and Respondents do not dispute, that at the time of his detention, Petitioner was awaiting an immigration court hearing scheduled for November 2026. (*See* Dkt. 1 ¶ 16.)

that day, which included a signed, but unserved, I-200 Warrant for Arrest of Alien. (*Id.* ¶ 11; Dkt. 6-3 at 1-5.) This warrant stated that there was probable cause to believe that Petitioner is removable was based on "biometric confirmation of the subject's identity and a records check of federal databases." (Dkt. 6-3 at 5.)

At 7:20 a.m. on December 26, 2025, ICE took custody of Petitioner at the Polk County Jail and transported Petitioner to the ICE Enforcement and Removal Operations ("ERO") office in Des Moines, Iowa. (Dkt. 9-1 ¶ 12.) After arriving at the ICE ERO office, ICE served Petitioner with an I-200 Warrant for Arrest of Alien. (*Id.* ¶ 13.) In contrast to the warrant provided to the jail with the detainer, this Warrant was dated December 26, 2025, and included additional bases for probable cause, including "statements made voluntarily by the subject to an immigration officer." (*Compare* Dkt. 6-3 at 5, *with* Dkt. 6-4 at 1.)

Following his detention by ICE, Petitioner's scheduled immigration court date was moved up. (Dkt. 1 ¶ 17.) In a hearing on April 6, 2026, an immigration judge denied Petitioner's asylum application and ordered his removal. (*Id.*; Dkt. 6-6 at 1.) Petitioner appealed the removal order, which remains pending. (Dkt. 1 ¶ 17.) The Board of Immigration Appeals has not yet set a briefing schedule for the appeal. (*Id.*) Petitioner has now been detained for over six months. (*Id.* ¶ 19.)

Petitioner filed this Petition for a Writ of Habeas Corpus on June 10, 2026. (Dkt. 1.) On June 11, 2026, United States District Judge Katherine M. Menendez issued an Order requiring Respondents to answer the Petition by June 18, 2026. (Dkt. 3 at 1.) The Order required Respondents' answer to include, among other things, "[s]uch affidavits

and exhibits as are needed to establish the lawfulness and correct duration of Petitioner's detention in light of the issues raised in the habeas petition." (*Id.*) Petitioner was permitted to file a reply to Respondent's answer by no later than June 25, 2026. (*Id.*) Respondents filed their answer on June 18, 2026 (Dkt. 5) and Petitioner filed his reply on June 25, 2026 (Dkt. 7).

Upon review of the parties' submissions, the Court determined that it required further information to resolve the legal issues presented in the Petition and, on June 29, 2026, ordered Respondents to file additional documentation. (*See* Dkt. 8.) In particular, the Court noted that it appeared from the submissions that Petitioner was a minor at the time he entered the United States, and the Court had not been provided with information or documentation regarding the process Petitioner underwent as an arriving minor, including whether he was unaccompanied. (*Id.*) The Court allowed the parties to seek leave of Court if they wished to file supplemental briefing in response to Respondents' anticipated filing. (*Id.*)

On July 8, 2026, Respondents filed a letter attaching the requested documents and declaration, "under objection, to preserve the issue for appeal," with an assertion that the evidence was "not relevant to the underlying requested relief." (Dkt. 9 at 1-2.) Notwithstanding this asserted lack of relevance, Respondents also "respectfully request[ed] the opportunity to further brief any issues that the Court identifies that were not previously raised in the Petition." (*Id.* at 2.) The Court already identified the issues for which it "require[d] further information to resolve the legal issues presented in the Petition" in its June 29, 2026 Order, namely Petitioner's minor status and whether he was

accompanied when he was encountered by Border Patrol at the southern border, the lack of clarity as to the circumstances of Petitioner's encounter with Border Patrol in December 2022, and the process that resulted in DHS issuing a Notice to Appear to Petitioner in Iowa approximately six weeks later. (Dkt. 8 at 2-3.) Respondents had notice of these issues, had the relevant evidence in their possession, and presumably had knowledge of the applicable law, but chose not to avail themselves of the opportunity to seek leave to file a supplemental brief. Under these circumstances, the Court sees no reason to again invite supplemental briefing from Respondents before issuing this Report and Recommendation.

On July 21, 2026, Petitioner filed a notice stating he did not seek leave to file supplemental briefing. (Dkt. 10.) This matter is now ripe for decision.

## II. LEGAL STANDARD

A federal court may provide habeas relief to a person who is detained in violation of the Constitution or laws of the United States. 28 U.S.C. § 2241(c)(3). "The right to challenge the legality of a person's confinement through a petition for a writ of habeas corpus extends to immigration-related detention." *Diego L., v. Bondi, et al.*, No. 26-CV-382 (JMB/DJF), 2026 WL 145206, at *2 (D. Minn. Jan. 20, 2026) (citation modified). Petitioner has the burden of proving his entitlement to relief by a preponderance of the evidence. *Jose J.O.E. v. Bondi*, 797 F. Supp. 3d 957, 965 (D. Minn. 2025).

## III. ANALYSIS

Petitioner seeks his immediate release, or, in the alternative, a bond hearing in which Respondents bear the burden of proof to demonstrate that Petitioner is a flight risk

or a danger to the community in order to justify further detention. (Dkt. 1 at 21-22.) Petitioner asserts that this relief is warranted because his detention is unlawful under the Fifth Amendment to the United States Constitution, and also contends that because of defects in the warrant process, his arrest was unlawful under the Fourth Amendment, federal law, and federal regulations. (*Id.* ¶¶ 46-58.)

**A. Statutory Basis for Detention**

Here, the Government asserts that Petitioner is lawfully detained pursuant to 8 U.S.C. § 1225(b)(2)(A). (Dkt. 5 at 2.) This statute provides that "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." U.S.C. § 1225(b)(2)(A). Petitioner preserves his argument that he is not lawfully detained under § 1225, but acknowledges the Eighth Circuit's decision in in *Avila v. Bondi* interpreting § 1225 to authorize immigration agents to detain noncitizens currently residing within the United States. (Dkt. 1 at 6-7 (citing 170 F.4th 1128 (8th Cir. 2026).)

As an initial matter, *Avila* does not foreclose Petitioner's constitutional challenges to his detention. In *Avila*, a divided panel of the Eighth Circuit Court of Appeals approved of DHS's interpretation of the INA to conclude that immigrants already present in the country can be treated as arriving aliens seeking admission and mandatorily detained under § 1225(b)(2)(A).[3] *See Avila*, 170 F.4th at 1136. However, as many courts

[3] Previously, the majority of courts within this District concluded that § 1225(b)(2)(A) applied only to non-citizens seeking initial entry into the country, while

in this District have found, *Avila* did not address challenges to such detention based on the Fourth and Fifth Amendments. *See, e.g.*, *Felipe S.P. v. Blanche*, No. 26-CV-2212 (NEB/DJF), 2026 WL 1911656, at *2 (D. Minn. July 2, 2026) ("But *Avila* does not close the door on [the petitioner's] as-applied Fifth Amendment challenge."); *Pedro A.D.L.O.O. v. Bondi*, No. 26-CV-01959, 2026 WL 948970, at *2 (D. Minn. April 8, 2026) ("The *Avila* opinion did not address the issue of due process."); *R. M. v. Blanche*, No. 26-CV-2283 (LMP/DLM), 2026 WL 1506306, at *2 n.3 (D. Minn. May 29, 2026) ("The Eighth Circuit did not, however, address the due process implications of mandatory detention without a bond hearing under Section 1225(b)(2) for noncitizens who are physically present inside the United States and have developed substantial connections within the country."); *Axel J.M.C. v. Stanski*, No. 26-CV-02281, 2026 WL 1171344, at *2 n.1 (D. Minn. April 29, 2026) (stating that *Avila* did not address constitutional challenges to detention). Accordingly, the Court considers the merits of Petitioner's claims, beginning with the Fifth Amendment challenge.

**B. Fifth Amendment Due Process**

The Due Process Clause prohibits the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. V. Due process has substantive and procedural components:

---

§ 1226(a), which allows for an individual's release on bond, applied to those apprehended already in the country. *See Martin R. v. Bondi*, No. 26-CV-168 (JMB/LIB), 2026 WL 115024, at *2 (D. Minn. Jan. 15, 2026) ("Courts have overwhelmingly rejected Respondents' interpretation that section 1225(b)(2) requires the mandatory detention of all noncitizens living in the country who are 'inadmissible' because they entered the United States without inspection.").

> So-called "substantive due process" prevents the government from engaging in conduct that shocks the conscience, or interferes with rights implicit in the concept of ordered liberty. When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. This requirement has traditionally been referred to as "procedural" due process.

*United States v. Salerno*, 481 U.S. 739, 746 (1987) (citation modified). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Outside of criminal proceedings, government detention violates the Due Process Clause except "in certain special and narrow nonpunitive circumstances, where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Id.* (citation modified).

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The Supreme Court has noted that due process is "flexible" in that it "calls for such procedural protections as the particular situation demands." *Morrissey*, 408 U.S. at 481. In *Mathews v. Eldridge*, the Supreme Court set forth three factors to determine what process is due in a given circumstance:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335; *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) ("*Mathews* dictates that the process due in any given instance is determined by weighing the private interest that will be affected by the official action against the Government's asserted interest, including the function involved and the burdens the Government would face in providing greater process." (citation modified)).

The protections of the Due Process Clause are not limited to United States citizens. In *Zadvydas v. Davis*, the Supreme Court explained that, while "certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders" once a person enters the country, "the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." 533 U.S. at 693. This decision built on a long line of Supreme Court opinions affirming the constitutional rights of persons inside the geographic borders of the United States, regardless of immigrations status. *See, e.g., Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) ("[A]ll persons within the territory of the United States are entitled to the protection guaranteed by [the Fifth Amendment.]").

Accordingly, the Supreme Court has held that "[i]t is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993). Detention during removal proceedings is, in general, "a constitutionally valid aspect of the process." *Demore v. Kim*, 538 U.S. 510, 511 (2003). However, detention by immigration authorities can run afoul of the Due Process Clause where there is no "sufficiently strong special justification" for civil detention. *See Zadvydas*, 533 U.S. at 690.

Notwithstanding these principles, the Government argues that Petitioner may not bring a fulsome due process challenge to his confinement because Petitioner has not been "admitted into the country pursuant to law." (Dkt. 5 at 7.) The Government suggests that as a result of this status, he has no due process rights beyond the process set forth in 8 U.S.C. § 1225(b), and because "Petitioner has received all the process he is entitled to under the statute; the due process clause requires nothing more." (Dkt. 5 at 7-8.) The Court begins with this argument.

**1. The Extent of Petitioner's Due Process Rights**

The Government's argument on this point relies on *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020). (Dkt. 5 at 7.) In *Thuraissigiam*, the petitioner entered the United States by crossing the southern border but was stopped by immigration authorities "within 25 yards of the border," and detained for expedited removal pursuant to 8 U.S.C. § 1225(b)(1). 591 U.S. at 114. Thuraissigiam sought asylum, but the reviewing officer concluded that he was ineligible for asylum because he lacked a credible fear of persecution, as defined by § 1225(b)(1)(B)(v). *Id.* An

Immigration Judge affirmed that decision after a de novo review. *Id.* Thuraissigiam then filed a habeas petition, seeking "a writ of habeas corpus, an injunction, or a writ of mandamus directing [the Department] to provide [him] a new opportunity to apply for asylum and other applicable forms of relief." *Id.* at 115 (alterations original). Thuraissigiam's petition did not seek release from custody. *Id.* The district court dismissed the petition, concluding that 8 U.S.C. § 1252(e)(2) precluded further review of the credible fear determination. *Id.*

The Ninth Circuit reversed, concluding § 1252(e)(2) violated the Suspension Clause. *Id.*; *see also Thuraissigiam v. U.S. Dep't of Homeland Sec.*, 917 F.3d 1097, 1119 (9th Cir. 2019), *rev'd and remanded sub nom. Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020). While the Ninth Circuit's analysis focused on the Suspension Clause, the court did state, as an aside in a footnote, that "we have held that a noncitizen situated almost exactly like Thuraissigiam had a constitutional right to expedited removal proceedings that conformed to the dictates of due process." 917 F.3d at 1111 n.15. On review, however, the Supreme Court asserted that "due process provided an independent ground for the decision below" and, after concluding its Suspension Clause analysis, proceeded to comment on what process was due to Thuraissigiam, a question not considered by the Ninth Circuit. 591 U.S. at 138; *see also id.* at 190 (Sotomayor, J., dissenting) ("The Court stretches to reach the issue whether a noncitizen like respondent is entitled to due process protections in relation to removal proceedings, which the court below mentioned only in a footnote and as an aside. In so doing, the Court opines on a matter neither necessary to its holding nor seriously in dispute below.") (citations

omitted). The posture of *Thuraissigiam* on appeal casts doubt on the precedential value of its due process analysis.[4] *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 737 (2007) (explaining that courts are not bound to follow dicta from prior cases "in which the point now at issue was not fully debated"). But even so, the Court considers *Thuraissigiam*'s due process analysis.

The *Thuraissigiam* court began from the longstanding proposition that non-citizens seeking admission to the United States from outside the country are not entitled to the same due process protections as persons inside the United States. 591 U.S. at 138-39. The Supreme Court contrasted "aliens who have established connections in this country" who "have due process rights in deportation proceedings," with "alien[s] at the threshold of initial entry" whose due process rights in seeking entry to the United States are limited to the conditions set by Congress for their "lawful entry into this country." *Id.* at 107. The Supreme Court explained that the "reason" for this rule is the "fundamental proposition" that:

> the power to admit or exclude aliens is a sovereign prerogative, the Constitution gives the political department of the government plenary authority to decide which aliens to admit, and a concomitant of that power is the power to set the procedures to be followed in determining whether an alien should be admitted.

---

4 Courts around the country have treated *Thuraissigiam*'s due process analysis as dicta. *E.g. Ontiveros v. Warden Corr. Ctr. of Nw. Ohio*, No. 3:26-CV-632, 2026 WL 1109422, at *7 (N.D. Ohio Apr. 24, 2026) ("Dicta from the Supreme Court's decision in *Thuraissigiam*, indicates that, for due process purposes, such immigrants are treated 'as if stopped at the border[,]' *see* [*Thuraissigiam*], and that they are only afforded the due process rights granted by Congress via statute."); *Robles v. Att'y Gen. United States*, No. 24-1963, 2025 WL 2924867, at *2 n.3 (3d Cir. Oct. 15, 2025) ("The dissent views Supreme Court dicta in [*Thuraissigiam*], as *sub silentio* overruling longstanding precedent . . . .").

*Id.* at 139 (citation modified).

The Supreme Court concluded that *Thuraissigiam*, who made it 25 yards into United States territory, should be considered in the category of those at the threshold of the United States seeking entrance, rather than those with "established connections" in the country. *Id.* at 107, 139. The Supreme Court reasoned that setting foot on United States soil is not enough to confer due process rights in seeking admission beyond the process established by law. *Id.* at 139. Because individuals arriving at a port of entry in the United States are "not considered to have entered the country" for purposes of this analysis, the Supreme Court reasoned that the same must be true for Thuraissigiam, who was apprehended 25 yards beyond the border. *Id.* at 139-40. The Supreme Court reasoned that the alternative would "create a perverse incentive to enter at an unlawful rather than a lawful location." *Id.* at 140. The Supreme Court concluded, for those reasons, that "an alien in respondent's position has only those rights *regarding admission* that Congress has provided by statute." *Id.* (emphasis added.)

Even if *Thuraissigiam*'s due process analysis is not dicta and has precedential authority, it does not control the present case for several reasons. First, the relief sought in this case is meaningfully different. Here, Petitioner seeks release from custody, which "lies at the heart of the liberty [the Due Process] Clause protects." *See Zadvydas*, 533 U.S. at 690. Thuraissigiam, on the other hand, did not seek release from custody. 591 U.S. at 117. Rather, he sought to use the habeas process to seek further review of his asylum claim. 591 U.S. at 114-15. The Supreme Court concluded that he had no due

process right to do so. *Id.* at 140 ("[A]n alien in respondent's position has only those rights *regarding admission* that Congress has provided by statute." (emphasis added)). The *Thuraissigiam* court did not consider due process rights in seeking release from detention, which under longstanding precedent does not depend on the legality of a person's entry into the United States. *See Zadvydas*, 533 U.S. at 693 ("Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, *unlawful*, temporary, or permanent." (emphasis added)). Indeed, the *Thuraissigiam* court made clear that the reason due process rights are limited in the context of seeking admission to the Unites States is "the government['s] plenary authority to decide which aliens to admit." 591 U.S. at 139. This reasoning is not applicable to due process challenges to detention, rather than admission.

The Court agrees with the courts in this District and around the country that have found *Thuraissigiam* inapplicable to due process challenges to detention. *See Felipe S.P.*, 2026 WL 1911656, at *6 ("*Thuraissigiam* held that noncitizens apprehended near the border have no constitutional right to review of their expedited deportation orders. The decision is inapplicable here because Felipe S.P. does not challenge the reviewability of his removal but rather the lawfulness of his detention without an individualized hearing.") (citation omitted); *Jesus Alejandro G. A. v. Blanche*, No. 26-CV-1932 (LMP/ECW), 2026 WL 1383138, at *8 (D. Minn. May 18, 2026) ("*Thuraissigiam*'s due process analysis was limited to whether an 'applicant for admission' has greater due process rights with respect to admissibility determinations than those provided by statute. But it did not address whether the petitioner's detention itself was unlawful or

inconsistent with the Due Process Clause."); *R. M. v. Blanche*, No. 26-CV-2283 (LMP/DLM), 2026 WL 1506306, at *6 (D. Minn. May 29, 2026) ("*Thuraissigiam* did not, however, address whether the petitioner's detention itself was unlawful or inconsistent with the Due Process Clause and did not deal with a core habeas challenge to detention . . . ."); *Juan C.M.C. v. Blanche*, No. CV 26-2402 (JWB/ECW), 2026 WL 2117276, at *3 (D. Minn. July 22, 2026) (concluding that *Thuraissigiam* addressed "the constitutional status of applicants for admission and the legal consequences of parole for purposes of the immigration laws" rather than a due process challenge to detention); *Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1171 (W.D. Wash. 2023) ("Defendants ask the Court to extract from *Thuraissigiam* a broad rule that any inadmissible noncitizen possesses only those due process rights afforded to them by statute, regardless of the nature of their status or the relief they seek. But such a conclusion is untethered to the claim in *Thuraissigiam* and the Court's reasoning. *Thuraissigiam's* discussion of due process is necessarily constrained to challenges to admissibility to the United States."); *R.D.T.M. v. Wofford*, No. 1:25-CV-01141-KES-SKO (HC), 2025 WL 2686866, at *3 (E.D. Cal. Sept. 18, 2025) ("*Thuraissigiam* held that a petitioner who was stopped at the border did not have any due process rights *regarding admission into* the United States. However, petitioner challenges her re-detention without a hearing; she does not challenge any determination regarding her admissibility.") (citation modified).

Even if *Thuraissigiam*'s analysis applied in the context of detention, this case presents a significantly different fact pattern. Petitioner arrived as an unaccompanied

juvenile and was released on an order of recognizance into the custody of his sister, following which he lived in the United States for over three years, developing significant connections with the country, in contrast to Thuraissigiam, who made it only 25 yards into the country before being detained pending expedited removal. (*See* Dkt. 1 ¶ 16.) In his reply, Petitioner argues that *Thuraissigiam*'s holding is limited to its facts. (Dkt. 7 at 7.) Petitioner quotes language from Justice Sotomayor's dissent, which notes that "the Court cabins its holding to individuals who are 'in respondent's position.' Presumably the rule applies to—and only to—individuals found within 25 feet of the border who have entered within the past 24 hours of their apprehension." 591 U.S. at 192-93 (Sotomayor, J., dissenting) (citation omitted).

The Government does not address the factual distinctions between these cases. It does, however, appear to argue that whether a person has been lawfully admitted to the country is the only fact that matters for this analysis. (*See* Dkt. 5 at 7, 21.) At several points in its brief, the Government quotes *Thuraissigiam* as holding that "for aliens who have never 'been admitted into the country pursuant to law, the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law.'" (Dkt. 5 at 7, 21 (quoting 591 U.S. at 138).) As Respondents recognize elsewhere in their Response (*id.* at 13), the full sentence reads:

> In 1892, the Court wrote that as to '*foreigners who have never been naturalized, nor acquired any domicil or residence within the United States*, nor even been admitted into the country pursuant to law,' 'the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law.

591 U.S. at 138 (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892) (emphasis added)). What the Supreme Court actually said matters because it suggests that it is not simply the absence of legal admission, but the absence of other connections, such as residence in the United States, that is relevant to due process considerations. Indeed, *Thuraissigiam* expressly states that "aliens who have *established connections* in this country have due process rights in deportation proceedings" in contrast to "an alien at the threshold of initial entry."[5] 591 U.S. at 107 (emphasis added). The Court concludes

---

[5] The Court notes that one sentence in *Thuraissigiam* appears at first glance to contradict *Thuraissigiam*'s emphasis on connections in this country. In a sentence describing the "entry fiction," *Thuraissigiam* states that "aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal are 'treated' for due process purposes 'as if stopped at the border.'" 591 U.S. at 139. For several reasons, the Court concludes that this sentence and the entry fiction do not control here.

First, even assuming that *Thuraissigiam*'s due process analysis is not *entirely* dicta, the entry fiction—an aside commenting on a hypothetical not presented in the case at issue—is very likely dicta. *See, e.g. Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 314 (E.D.N.Y. 2025) ("[T]he passing reference in *Thuraissigiam* to 'those paroled elsewhere in the country' is dicta and does not alter this conclusion here."); *Abdyrakhmanov v. Baltazar*, No. 26-CV-01875-NYW, 2026 WL 1800941, at *5 (D. Colo. June 23, 2026) ("[The Supreme Court] stated, in dicta, that 'aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are treated for due process purposes as if stopped at the border.'"); *Castillo v. Olson*, No. 26 CV 6843, 2026 WL 1894096, at *7 (N.D. Ill. July 1, 2026) ("Respondents next make an argument based on a single sentence of dicta from the Supreme Court decision in [*Thuraissigiam*]."); *Galicia v. Lyons*, No. CV 26-11468-FDS, 2026 WL 1847046, at *4 (D. Mass. June 26, 2026) ("Justice Alito's opinion for the Court states, albeit in dicta, that "aliens who arrive at ports of entry—*even those paroled elsewhere in the country for years pending removal*—are 'treated' for due process purposes 'as if stopped at the border.'").

But even if this sentence is not dicta, it does not control in this case. As discussed above, *Thuraissigiam* considered due process rights "regarding admission," and does not apply to the liberty interest in freedom from detention. *See* 591 U.S. at 105. There is no

that Petitioner's established connections within the United States distinguish him from Thuraissigiam. *See Jesus Alejandro G. A.*, 2026 WL 1383138, at *9 ("[A] key factual distinction is that the petitioner in Thuraissigiam was stopped by immigration authorities within 25 yards of the border, immediately detained, and never released. And *Thuraissigiam*'s holding, by its own language, is limited to noncitizens at the border—that is, those who are seeking initial entry." (citation modified)).

This case is also distinguishable from *Thuraissigiam* with respect to the legal process Petitioner underwent upon arriving in the United States. Thuraissigiam was detained near the border and subject to expedited removal proceedings under § 1225(b)(1). 591 U.S. at 109. Petitioner, however, arrived as an unaccompanied juvenile, was placed into the custody of HHS ORR pursuant to 8 U.S.C. § 1232(b)(3), and was subsequently released on an order of recognizance. (*See* Dkt. 9-1 ¶ 5.) The legal context of an unaccompanied minor's arrival and release into the United States meaningfully impacts their due process rights. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1195 (N.D. Cal. 2017) ("[T]he government seems to assume that minors like A.H. have no greater interest in freedom from detention than any noncitizen caught crossing the border. This ignores the context in which these detentions arose. The federal government has already made a determination that minors like A.H. should not be

basis in *Thuraissigiam* to read this sentence as limiting the due process rights of a person seeking freedom from detention, and to do so would run afoul of *Zadvydas*'s holding that "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, *unlawful*, temporary, or permanent"—a holding that *Thuraissigiam* did not overrule. *See* 533 U.S. at 693 (emphasis added).

detained, and has therefore made a decision to place them with a parent or other sponsor in the community.”), *aff’d sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). *Thuraissigiam* did not consider how such proceedings might affect an individual’s due process rights.

In addition to *Thuraissigiam*, the Government cites *Jennings v. Rodriguez*, 583 U.S. 281 (2018), for the proposition that detention statutes including §1225(b) “did not open the door for any ‘reasonableness’ limitation required for Due Process.” (Dkt. 5 at 12 (citing *Jennings*, 583 U.S. at 302-303.)) This characterization significantly overstates *Jennings*, which the Supreme Court decided on statutory interpretation grounds, explicitly declining to reach the underlying due process question.[6] *See* 583 U.S. at 312.

---

[6] In *Jennings*, a class of non-citizen detainees argued that in the absence of an individualized bond hearing, certain detention statutes violated the Due Process Clause. 583 U.S. at 291. On appeal, the Ninth Circuit applied the canon of constitutional avoidance in order to construe §§ 1225(b) and 1226(c) as containing an implicit sixth month limit, after which the Government must conduct a bond hearing pursuant to § 1226(a). *Id.* at 292. The Supreme Court reversed, concluding that this was an improper application of the canon of constitutional avoidance because the Ninth Circuit’s construction was an implausible reading of the statutes. *Id.* at 297. The Supreme Court explicitly did not reach the merits of the underlying due process challenge. *Id.* at 312 (“Because the Court of Appeals erroneously concluded that periodic bond hearings are required under the immigration provisions at issue here, it had no occasion to consider respondents’ constitutional arguments on their merits. Consistent with our role as ‘a court of review, not of first view,’ *Cutter v. Wilkinson,* 544 U.S. 709, 718, n. 7, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005), *we do not reach those arguments. Instead, we remand the case to the Court of Appeals to consider them in the first instance*.” (emphasis added)).

The Government recognizes that “the *Jennings* court, strictly speaking, dealt only with the issue of constitutional avoidance,” but asserts that “the court explicitly rejected the notion put forth by the dissent that the detention statutes required a test of ‘reasonableness’ under the Fifth Amendment.” (Dkt. 5 at 12 (citing *Jennings*, 583 U.S. at 305-06.).) Having carefully reviewed *Jennings*, the Court finds no such explicit rejection

Accordingly, the Government's reliance on *Jennings* is misplaced, as that opinion has no bearing on the constitutional question presented in this Petition. *See R. M. v. Blanche*, No. 26-CV-2283 (LMP/DLM), 2026 WL 1506306, at *3 n.4 (D. Minn. May 29, 2026) (rejecting the Government's reliance on *Jennings* "because it did not address the petitioners' due process claims").

For all these reasons, the Court rejects the Government's argument that Petitioner has no right to due process beyond the process set forth in § 1225(b). The Court proceeds to consider whether Petitioner's detention pursuant to § 1225(b) violates his due process rights.

**2. The Applicable Due Process Analysis**

The Petition describes its claim for relief as "Procedural Due Process." (Dkt. 1 at 14.) However, the Government asserts that because Petitioner "is challenging Congress's substantive decision to mandate detention pending removal proceedings, without regard to [his] flight risk or dangerousness" rather than "the procedures used to determine he is subject to the detention mandate of § 1225(b)(2)(A)," Petitioner raises a substantive due process claim and not a procedural due process claim. (Dkt. 5 at 8.) Respondents cite *Connecticut Department of Public Safety v. Doe* for the proposition that procedural due

---

on the cited pages, or any other page of the opinion. While *Jennings* does cite *Demore*, which contains a Fifth Amendment analysis of § 1226(c), *Jennings* cited *Demore* only for its interpretation of the statute, not its constitutional analysis. 583 U.S. at 304 ("In *Demore v. Kim,* 538 U.S., at 529, 123 S.Ct. 1708 we distinguished § 1226(c) from the statutory provision in *Zadvydas* by pointing out that detention under § 1226(c) has 'a definite termination point': the conclusion of removal proceedings. As we made clear there, that 'definite termination point'—and not some arbitrary time limit devised by courts—marks the end of the Government's detention authority under § 1226(c).").

process "does not require the opportunity to prove a fact that is not material to the State's statutory scheme." (*Id.* at 9 (quoting 538 U.S. 1 (2003).)

The Court agrees that certain arguments in the Petition sound in substantive due process. For instance, the Petition cites principles of substantive due process, in that "freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects" and that "civil immigration detention must bear a reasonable relation to the purpose for which the individual was committed." (Dkt. 1 ¶ 28 (quoting *Zadvydas*, 533 U.S. at 690 and *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) (citation modified).) But the Court concludes that the gravamen of the Petition can and should be analyzed in a procedural due process framework. *See Jesus Alejandro G. A.*, 2026 WL 1383138, at *10 n.14 ("[T]here is often some overlap between the two analyses when substantive and procedural due-process claims are raised together based on the same facts.").

Here, the Petitioner argues that it is not merely his detention pursuant to § 1225(b)(2) that violates his due process rights. (Dkt. 1 ¶ 47.) Rather, Petitioner argues that it is his re-detention, following his prior release, that violates due process. (*Id.*) Challenges to re-detention after release are often framed as procedural due process arguments. *E.g. Muse v. Mullin*, No. 26-CV-4024-CJW-MAR, 2026 WL 1008532, at *4 (N.D. Iowa Apr. 14, 2026) ("[O]nce the government opts to provide a liberty interest, it cannot arbitrarily revoke that interest without due process of law." (citing *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)).

Accordingly, the Court analyzes Petitioner's claim within the procedural due process framework that Petitioner has raised. The Petition applies the *Mathews* factors to conclude that Petitioner's detention violates his due process rights. (Dkt. 1 ¶¶ 48-54.) Respondents, however, argue that *Demore v. Kim*, 538 U.S. 510 (2003), and *Banyee v. Garland*, 115 F.4th 928 (8th Cir. 2024), foreclose application of the *Mathews* test here. (Dkt. 5 at 14-16.) The Court disagrees, as *Demore* and *Banyee*'s holdings apply only to the specific statutory scheme of 28 § U.S.C. 1226(c), which is not at issue in this case.

In *Demore v. Kim*, the Supreme Court considered a Fifth Amendment challenge to 28 U.S.C. § 1226(c), which mandates detention during removal proceedings for individuals convicted of certain crimes. 538 U.S. 510, 517-18 (2003). The petitioner in that case argued that his detention under § 1226(c) violated his due process rights because the statute did not provide for a bond hearing to determine whether he posed either a danger to society or a flight risk. *Id.* at 514. The district court granted the petition. *Id.* On review, the Ninth Circuit concluded that the Government had not provided a sufficient justification "for no-bail civil detention sufficient to overcome a lawful permanent resident alien's liberty interest" and affirmed, holding that § 1226(c) violated substantive due process as applied to the petitioner. *Id.* at 515.

The Supreme Court reversed. *Id.* at 526. In doing so, the Supreme Court relied on its previous decision in *Carlson v. Landon* for the proposition that immigration detention could be justified for certain classes of detainees without individualized findings of flight risk or dangerousness. *Id.* at 523-26 (citing 342 U.S. 524 (1952)). In that 1952 case, the Supreme Court upheld the detention of "aliens who were deportable because of their

participation in Communist activities." *Id.* at 523-24 (citing 342 U.S. 524 (1952)). The Supreme Court had "noted that Congress had chosen to make such aliens deportable based on its understanding of Communists' attitude toward the use of force and violence to accomplish their political aims" and concluded that "the INS could deny bail to the detainees by reference to the legislative scheme" even without individualized findings regarding flight risk or dangerousness. *Id.* at 524 (citation modified).

In considering whether the statutory scheme behind 28 U.S.C. § 1226(c) justified detention without a bond hearing, the *Demore* court closely examined Congress's purpose and process in enacting 28 U.S.C. § 1226(c). *Id.* at 518-21. The Supreme Court explained that "Congress had before it evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully" and cited statistics regarding such "criminal aliens" from various congressional reports and hearings. *Id.* at 528, 518-21. The Supreme Court concluded that Congress was "justifiably concerned that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers." *Id.* at 513. The Supreme Court concluded that, unlike the detention at issue in *Zadvydas*, which did not "bear[] a reasonable relation to the purpose for which the individual was committed," detention of the relevant category of "criminal aliens" pursuant to § 1226(c) served the government's purpose of effectuating their removal. *Id.* at 527.

The *Demore* court also distinguished *Zadvydas* based on facts in the record indicating that detention pursuant to § 1226(c) was usually shorter than the 90 days considered presumptively valid in *Zadvydas*:[7]

> The Executive Office for Immigration Review has calculated that, in 85% of the cases in which aliens are detained pursuant to § 1226(c), removal proceedings are completed in an average time of 47 days and a median of 30 days. In the remaining 15% of cases, in which the alien appeals the decision of the Immigration Judge to the Board of Immigration Appeals, appeal takes an average of four months, with a median time that is slightly shorter. These statistics do not include the many cases in which removal proceedings are completed while the alien is still serving time for the underlying conviction. In those cases, the aliens involved are never subjected to mandatory detention at all. In sum, the detention at stake under § 1226(c) lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal.

538 U.S. at 529-30 (citations omitted).

In sum, while *Demore* rejected the petitioner's due process challenge to his detention, it did not do so by broadly concluding that detention pending deportation was always justified. Rather, it carefully considered the evidence before Congress as to the purpose of detention for the narrow class of "criminal aliens" within the scope of § 1226(c), considered in light of the length of detention at issue.[8] *Demore* does not directly control this case, as Petitioner is not detained subject to § 1226(c). Rather,

---

[7] Here, it should be noted, Petitioner has been detained for over six months, a longer period than the Supreme Court considered in *Demore*, and a briefing schedule has not yet been set for Petitioner's appeal.

[8] Despite *Demore*'s consideration of the length of detention at issue, the Eighth Circuit later concluded that: "Due process imposes no time limit on detention pending deportation." *Banyee v. Garland*, 115 F.4th 928, 930 (8th Cir. 2024).

*Demore* suggests that when the government seeks to detain individuals pending deportation without an individualized determination that detention is necessary, reviewing courts must carefully consider the statutory scheme to assess whether detention is justified for the affected class of detainees. Here, Petitioner is detained under § 1225(b)(2), which the Government describes as a broad "catchall" provision. (*See* Dkt. 5 at 14.) Unlike in *Demore*, the statutory scheme is not limited to a specific class of persons for whom Congress has carefully considered whether danger to the community and risk of flight justify detention.

Neither does the Eighth Circuit's decision in *Banyee* foreclose an application of the *Mathews* factors here. In *Banyee*, the Eighth Circuit concluded that due process did not require a time limit on detention pursuant to § 1226(c). 115 F.4th at 933. In reaching that conclusion, the court noted that there was no room for an interest balancing test, such as the *Mathews* test, because "*Zadvydas* and *Demore* have already done whatever balancing is necessary." *Id.* Those cases, however, have not done the necessary balancing with respect to § 1225(b)(2) detention. As previously discussed, the balancing analysis conducted in *Demore* considered the narrow class of persons detained under § 1226(c), not the broad, purportedly "catchall" provision of § 1225(b)(2). Neither does *Zadvydas*, which considered detention following a final order of removal pursuant to 8 U.S.C. § 1231, conclusively balance the interests at stake in Petitioner's detention pursuant to § 1225(b)(2). Many courts in this District have noted these distinctions and concluded that *Demore* and *Banyee* do not preclude courts from applying the *Mathews* factors to detention pursuant to § 1225(b). *E.g. Pedro A.D.L.O.O. v. Bondi*, No. 26-CV-

01959 (DWF/DJF), 2026 WL 948970, at *2 n.2 (D. Minn. April 8, 2026) (concluding *Banyee* does not prevent application of the *Mathews* factors to § 1225(b)); *Alicia N.F.C. v. Blanche*, No. CV 26-2145 (DWF/JFD), 2026 WL 1005079, at *2 n.2 (D. Minn. Apr. 14, 2026) (same); *Axel J.M.C. v. Stanski*, No. 26-CV-02281 (JRT/EMB), 2026 WL 1171344, at *3 (D. Minn. April 29, 2026) (same); *Jesus Alejandro G. A. v. Blanche*, No. 26-CV-1932 (LMP/ECW), 2026 WL 1383138, at *6-8 (D. Minn. May 18, 2026) (concluding that neither *Banyee* nor *Demore* govern due process analysis of § 1225(b)); *R. M. v. Blanche*, No. 26-CV-2283 (LMP/DLM), 2026 WL 1506306, at *4-5 (D. Minn. May 29, 2026) (same); *Juan C.M.C. v. Blanche*, No. CV 26-2402 (JWB/ECW), 2026 WL 2117276, at *4 (D. Minn. July 22, 2026) (distinguishing *Banyee* from § 1225(b) detention and applying *Mathews* factors). The Court agrees, and concludes that neither *Demore* nor *Banyee* dispose of the due process question presented in this case, nor do these cases foreclose the application of the *Mathews* factors.

Respondents make one more argument against the application of *Mathews* here—that *Mathews* "applies to statutory schemes" and is not an individualized test, and that Petitioner's proposed application of *Mathews* would turn it into "a kind of proto-bond-hearing bond hearing." (*See* Dkt. 5 at 16-19.) Respondents concede that the Eighth Circuit has used *Mathews* to evaluate as-applied arguments while simultaneously arguing that "the Eighth Circuit has refrained from using it as an individualized test." (*Id.* at 18.) None of the cases cited by Respondents stand for the proposition that *Mathews* cannot and has not been used to evaluate due process claims as to a specific individual. Indeed, Respondents recognize that "[a]s-applied challenges are more fact-specific and apply

only to the party before the court." (*Id.* at 17.) It may be that Respondents are reading an Eighth Circuit's holding that a specific party's as-applied challenge fails in a specific case as a holding that *Mathews* cannot be used as an "individualized test." Respondents' argument is entirely unclear. The Court applies *Mathews* to Petitioner's specific circumstances and recommends relief as to Petitioner—the party before the Court—as is proper for an as-applied due process challenge.

### 3. Application of the *Mathews* Factors

The first factor of the *Mathews* balancing test is "the private interest that will be affected by the official action." Respondents rely on *Thuraissigiam* to argue that Petitioner's detention "does not implicate any fundamental rights." (Dkt. 5 at 21.) But as previously discussed, *Thuraissigiam* did not consider a challenge to detention. Here, Petitioner's "interest in being free from physical detention by the Government is the most elemental of liberty interests." *Alejandro G.A.*, 2026 WL 1383138, at *11 (quoting *Hamdi*, 542 U.S. at 529); *see also Felipe S.P.*, 2026 WL 1911656, at *2 ("Freedom from physical restraint 'lies at the heart of the liberty' that the Due Process Clause protects." (quoting *Zadvydas*, 533 U.S. at 690)). In particular, Petitioner and others in his position have a liberty interest created by their release from custody on an order of recognizance. "Courts have recognized the self-evident idea that an individual who has been released from custody to live a productive life in the community obtains a protected interest in their continued liberty." *Alejandro G.A.*, 2026 WL 1383138, at *11 (citation modified).

The Petition refers to Petitioner's prior release generally as "parole," and in his reply brief Petitioner suggests that upon his arrival in 2022, he was detained and

subsequently released on conditional parole pursuant to § 1226(a). (Dkt. 1 ¶ 16; Dkt. 7 at 4-5.) The supplemental information provided by Respondents, however, indicate that Petitioner was detained and released pursuant to the statutory scheme governing unaccompanied minors arriving in the United States. (*See* Dkt. 9-2 ¶¶ 4-9.) For the reasons discussed below, the Court concludes that Petitioner has a protected liberty interest in his release pursuant to this statutory scheme.

Under the the Trafficking Victims Protection Reauthorization Act ("TVPRA"), "any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3). HHS must then promptly place the child "in the least restrictive setting that is in the best interest of the child," and may consider "danger to self, danger to the community, and risk of flight."[9] 8 U.S.C. § 1232(c)(2)(A).

HHS ORR is responsible for making these placement determinations, and federal law requires that it:

> shall consult with appropriate juvenile justice professionals, the Director of the Bureau of Citizenship and Immigration Services, and the Assistant

[9] The same considerations apply after an arriving juvenile turns eighteen: "If a minor described in subparagraph (A) reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security, the Secretary shall consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2)(B).

> Secretary of the Bureau of Border Security to ensure that such determinations ensure that unaccompanied alien children described in such subparagraph—
>
> (i) are likely to appear for all hearings or proceedings in which they are involved;
>
> [and]
>
> (iii) are placed in a setting in which they are not likely to pose a danger to themselves or others.

6 U.S.C. § 279(b)(2)(A). In other words, before releasing a minor into the community in the care of a relative, HHS ORR makes a determination that the minor will not pose a danger to the community or a risk of flight. *See R.D.T.M. v. Wofford*, No. 1:25-CV-01141-KES-SKO (HC), 2025 WL 2686866, at *2 (E.D. Cal. Sept. 18, 2025) ("In releasing petitioner, ORR determined that petitioner was not a flight risk or danger to the community."); *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1177 (N.D. Cal. 2017) ("[T]he minor's placement with the sponsor reflects a determination by the federal government that the minor is neither dangerous nor a flight risk."), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). As other district courts in the Eighth Circuit have found, the release of a minor pursuant to this statutory process creates a liberty interest analogous to release on conditional parole for the purpose of a due process analysis. *Ixquiactap-Ajpacaja v. Mullin*, No. 4:26-CV-3143, 2026 WL 1295702, at *1 (D. Neb. May 12, 2026) ("While the petitioner was not released 'on his own recognizance,' *see* § 279(b)(2)(B), the circumstances are analogous, and the petitioner was effectively subject to conditional parole."); *Francisco-Francisco v. Mullin*, No. 8:26-CV-279, 2026 WL 2042292, at *1 (D. Neb. July 15, 2026) (citing *Ixquiactap-Ajpacaja*);

*see also Guaman-Pinto v. Archambeault*, No. 26-CV-1716-JES-BLM, 2026 WL 849302, at *2 (S.D. Cal. Mar. 27, 2026)("Aliens afforded release under the TVPRA have the same due process protections regarding re-detention as those granted parole or release as adults: at a minimum, they are entitled to notice and opportunity to be heard regarding the individualized changed circumstances justifying revocation in their case."). The Court concludes that the first *Mathews* factor weighs in favor of Petitioner.

The second *Mathews* factor is "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. Here, there is a risk of erroneous deprivation because "the government's authority to detain noncitizens is not limitless and should advance two regulatory goals: (1) ensuring the appearance of noncitizens at their immigration proceedings; and (2) preventing danger to the community while those proceedings are ongoing." *Jesus Alejandro G. A.*, 2026 WL 1383138, at *11 (citing *Zadvydas*, 533 U.S. at 690). This risk is heightened in Petitioner's case because, as previously discussed, the government already determined that Petitioner did not present a danger to the community or a risk of flight. The Government has not alleged that Petitioner violated any condition of his release, or that any changed circumstance has affected its determination of his dangerousness or risk of flight. There is a high risk that Petitioner's re-detention is an arbitrary and unjustified deprivation of his liberty, and additional procedural safeguards, such as a bond hearing, would alleviate that risk. *See id.* at *12 ("It may be the case that circumstances have changed such that the determination made upon his initial grant of parole no longer holds

true. But Jesus Alejandro G. A. is entitled to present evidence to an immigration judge to show that he is not a flight risk or danger to the community, *see Zadvydas*, 533 U.S. at 690, and to rebut any contrary evidence offered by the Government to justify his ongoing immigration detention."). Respondents argue that Petitioner's removal proceedings and ongoing appeal "removes any substantial risk that an alien will be erroneously deprived of his rights." (Dkt. 5 at 22.) These removal proceedings, however, do not provide Petitioner an opportunity to challenge his detention. The Court therefore concludes that the second *Mathews* factor weighs in favor of the Petitioner.

The final *Mathews* factor is "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. Respondents identify the Government's "sovereign prerogative" to control matters related to immigration as relevant to this factor. (Dkt. 5 at 22.) Indeed, courts have long held that detention during deportation proceedings can serve this function. *See Demore*, 538 U.S. at 534. Respondents cite a statistic regarding the total number of cases pending in immigration court, but do not identify how many of those cases involve detention under § 1225(b)(2) following a prior release from detention. As other courts in this District have observed, prior to the implementation of ICE's July 2025 guidance memo, the Government provided bond hearings to this class of detainees, then considered detained under § 1226(a), as a matter of course. *See Jesus Alejandro G. A.*, 2026 WL 1383138, at *3. While it may impose some fiscal and administrative burden to conduct such bond hearings, the Court concludes that the burden on the Government here is outweighed by

Petitioner's liberty interest and the risk of erroneous deprivation in the absence of a bond hearing. *See Pedro A.D.L.O.O*, 2026 WL 948970, at *3 (concluding that *Mathews* factors weigh in favor of petitioner detained pursuant to § 1225(b)(2)); *Alicia N.F.C.*, 2026 WL 1005079, at *3 (same); *Axel J.M.C.*, 2026 WL 1171344, at *4 (same); *Jesus Alejandro G. A.*, 2026 WL 1383138, at *12 (same); *R. M.*, 2026 WL 1506306, at *10 (same); *Juan C.M.C.*, 2026 WL 2117276, at *4 (same).

**4. The Appropriate Remedy**

Petitioner argues that the violation of his due process rights requires immediate release. (Dkt. 1 ¶¶ 59-61.) Petitioner argues that immediate release, rather than a bond hearing is the appropriate remedy here, because his ongoing detention is unlawful. (*Id.* ¶ 59.) Petitioner seeks a bond hearing in the alternative, but notes that a bond hearing is likely to be an illusory remedy, citing "Respondents' oft-stated position following *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025), that administrative immigration courts have no jurisdiction to conduct bond hearings for noncitizens detained under 8 U.S.C. § 1225(b)(2)" and a recent case in this District in which an immigration judge declined to conduct a meaningful bond hearing despite an order on a habeas petition granting relief in the form of such a hearing. (*Id.* ¶ 61.) In that case, *David J.C.P. v. Blanche*, an immigration judge held a "bond hearing," but "did not make an individual assessment of his flight risk or danger to the community," and "instead ordered that bond would be denied because the immigration judge lacked jurisdiction." No. 26-CV-02181 (DWF/ECW), Dkt. 19 at *2 (D. Minn. May 14, 2026).

Respondents appear to take the same position in this case, namely that immigration authorities cannot provide a bond hearing, asserting:

> Even presuming *Mathews* supplies an avenue for relief, Petitioner is not entitled to a bond hearing, whether under § 1226(a) or any other framework. Put simply, once DHS establishes that Petitioner is subject to mandatory detention under § 1225(b)(2), there is no mechanism for Petitioner to assert he is owed a bond hearing or release.

(Dkt. 5 at 19.) This argument is misplaced, as the due process violation in this case does not flow from the deprivation of a right or interest created under § 1225(b)(2), but from the deprivation of the liberty interest that was created when Petitioner was released on an order of recognizance and placed in the community with his sister, where he lived for years and developed substantial connections with the country. What due process requires in this case is not the statutory bond hearing set forth in § 1226(a). Rather, whether referred to as a "bond hearing" or something else, due process requires that Petitioner receive notice and a meaningful opportunity to be heard on the revocation of his order of recognizance, as well as an opportunity to challenge whether any changed circumstances justified his re-detention and whether his detention is justified by any risk of flight or danger to the community.

Here, the "appropriate remedy is to require Respondents to provide the constitutionally adequate process that has been lacking." *Juan C.M.C.*, 2026 WL 2117276, at *5. However, if Respondents fail to provide this process within the time set by the Court, the appropriate remedy will be immediate release. *See id.* at *6 (ordering that "[i]f Respondents do not provide the hearing required by Paragraph 3 within seven (7) days of the date of this Order, Petitioner shall be immediately released from

custody."); *David J.C.P.*, No. 26-CV-02181 (DWF/ECW), *3-4 (ordering immediate release following the Government's failure to provide process previously ordered by the court). Further, if Respondents take the position in this action or in the immigration proceedings that they are unable to provide Petitioner with such constitutional process, or should Respondents provide a "bond hearing," individualized custody hearing, or similar proceeding that does not provide Petitioner with notice and a meaningful opportunity to be heard on the revocation of his order of recognizance, as well as an opportunity to challenge whether any changed circumstances justified his re-detention and whether his detention is justified by any risk of flight or danger to the community; that deprives Petitioner of his right to counsel, including by not providing Petitioner or counsel with sufficient notice of the hearing; or that is otherwise "illusory," including because the immigration judge believes they lack jurisdiction, the remedy should be immediate release.

**C. The Warrant Requirement**

In addition to his due process challenge to his detention, Petitioner argues that the Government's failure to serve him with a warrant prior to his arrest entitles him to immediate release. (Dkt. 1 ¶ 59.) The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment applies to arrests of undocumented immigrants for detention pending removal proceedings. *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010). Accordingly, warrantless arrests for the purpose of removal proceedings are unconstitutional unless they are

supported by probable cause. *Id.* Here, the Government does not assert that the arrest was supported by probable cause. (*See generally* Dkt. 5.) As such, the only question is whether the arrest was warrantless.

The Government has produced a signed administrative warrant dated December 25, 2025 that was generated prior to Petitioner's arrest by immigration authorities. (Dkt. 6-3 at 5.) Petitioner argues that the warrant in this case was defective because it was not served on Petitioner prior to his arrest. (Dkt. 7 at 5-7 (citing *Marlon S.T.L., P, v. Pamela Bondi, et al.*, No. 26-665 (DWF/LIB), 2026 WL 251975, at *2 (D. Minn. Jan. 30, 2026).) However, as Respondents point out, other courts in this District have concluded that a warrant issued before, and served shortly after, an arrest satisfies the warrant requirement. (*See* Dkt. 5 at 6 (citing *Richard Alexander C. C. v. Easterwood,* 26-cv-02137 (LMP/ECW) (D. Minn. May 4, 2026)).)

The Court finds *Marlon*, the case Petitioner relies on here, to be inapposite. While *Marlon* does state that "[a] detainee being held pursuant to § 1226(a), as Petitioner is here, must have been served an arrest warrant prior to detainment," there was no evidence in that case that the Government had a warrant to arrest the Petitioner at all. 2026 WL 251975, at *2. While it is clear that a warrant must *issue* before an arrest, *Marlon* does not explain why the same is true for service. The court in *Sinan O. v. Noem* closely considered this question, and concluded that § 1226(a), which permits arrest only "[o]n a warrant," is silent as to service. No. 26-cv-386 (LMP/JFD), slip op. at *4 (D. Minn. Feb. 3, 2026). The Court also considered whether 8 C.F.R. § 287.5(e)(3) requires service of a warrant before arrest, but reasoned that that regulation "simply lists the types of

immigration officers who are authorized to serve administrative warrants" and "[n]owhere does that regulation require that an administrative warrant be served on a noncitizen to be deemed valid." *Id.*

The Court concludes that no relief is warranted with respect to Petitioner's Fourth Amendment claim because Petitioner has not identified any apposite authority requiring a warrant to be served prior to arrest.

**D. Verification of the Petition**

Finally, the Court addresses Respondents' argument regarding the verification of the Petition. Respondents cite 28 U.S.C. § 2242, which provides that an "[a]pplication for a writ of habeas corpus shall be in writing signed and verified by the person for whose relief it is intended or by someone acting in his behalf," and argues that because this Petition was signed and verified by Petitioner's attorney, rather than Petitioner himself, the Petition should be dismissed. (Dkt. 5 at 3-5.)

Respondents quote *Smith v. Armontrout*, which states that "[a] person generally lacks standing to prosecute a federal habeas corpus petition on behalf of another unless he or she can show a reasonable excuse as to why the detainee did not sign and verify the petition, and a sufficient relationship and interest linking the would-be next friend to the detainee." (*Id.* at 3 (quoting 812 F.2d 1050, 1053 (8th Cir. 1987).) *Armontrout*, however, did not address whether an attorney can verify a habeas petition on behalf of their client. In *Armontrout*, a death-row inmate, Gerald Smith, had decided to abandon his post-conviction challenges. 812 F.2d at 1052-53. His brother, Eugene Smith, believed that Gerald was not competent to make that decision, and filed a habeas petition

acting as Gerald's next friend. *Id.* While the Eighth Circuit noted that the sufficiency of Eugene's relationship with his brother Gerald was undisputed, it dismissed Eugene's next-friend petition for lack of standing because it concluded that Gerald was competent to decide to forgo habeas review, and his decision to do so was voluntary. *Id.* at 1053, 1059. Plainly, *Armontrout* presented a very different set of facts than the facts of this case, where an attorney has signed a petition on behalf of the detained person the attorney represents. Respondents have cited no authority, and the Court is aware of none, which prevents an attorney from signing and verifying a habeas petition on behalf of their client.[10] In contrast, Petitioner has identified cases concluding that attorneys may sign and verify habeas petitions on behalf of their clients. (Dkt. 7 at 3 (citing *Lucky v. Calderon*, 86 F.3d 923, 925 (9th Cir. 1996), and *Stephen v. Sec'y Dep't of Corr.*, No. 20-CV-727, slip op at 10 n.2 (M.D. Fla. Feb 24, 2023).)

Respondents suggest that the Petition should have pleaded facts "as to why Petitioner's Counsel could not obtain Petitioner's verification." (Dkt. 5 at 4.) Again, Respondents provide no authority for imposing this pleading standard. Rather, Respondents contrast this case to the Ninth Circuit case of *Warren v. Cardwell*, for the

---

[10] In addition to *Armontrout*, Respondents cite several cases from outside this Circuit for the proposition that a habeas petition must be signed and verified by the individual in custody or someone acting on their behalf. (*See* Dkt. 5 at 3.) None of these cases apply to attorneys acting on behalf of their clients. In *Dixon v. Clark*, a pro se habeas petitioner did not sign or verify their petition at all, and the court concluded that the petition must be dismissed with leave to amend. 714 F. Supp. 2d 1029, 1032 (C.D. Cal. 2010). Similarly in *In re Brabson*, a judge noted that the court would be justified in disregarding the pro se petitioner's unverified factual allegations. 167 F. Supp. 619, 620 n.2 (S.D. NY 1958).

proposition that "attorney allowed to file and verify petition for client prisoner where client could not sign because prison was not 'locked down.'"[11] (*Id.* (quoting *Warren v. Cardwell*, 621 F.2d 319 (9th Cir. 1980).) In *Warren*, a prisoner wrote to his wife about threats to his life that he faced in prison, stated that he wanted his attorney to do something, and criticized his attorney's ability. 621 F.2d at 321. The prisoner's wife then hired a new attorney, who flew to the state where the prisoner was incarcerated. *Id.* Because the prison was locked down, the new attorney was not permitted to meet with the prisoner. *Id.* Instead, the new attorney filed a habeas petition in his own name, on the prisoner's behalf. *Id.* The reviewing court noted that under the circumstances, "it was permissible, although irregular" for the attorney to file the petition in his own name on behalf of the true party in interest. *Id.* at 321 n.1. *Warren* did not impose a requirement that an attorney must always plead facts showing why the attorney could not obtain the petitioner's verification. It also does not support the proposition that an attorney representing a petitioner in a habeas matter must plead certain circumstances to justify signing and verifying the petition on the petitioner's behalf.

Indeed, as another court in this District has noted, in recent months, "ICE has been less than diligent in communicating with detainees and their counsel regarding a detainee's circumstances of detention and has transferred detainees frequently, quickly, without notice, and often with no way for attorneys to know where or for how long their

---

[11] There appears to be a typographical error in Respondents' parenthetical describing *Warren* as involving a prison that "was not 'locked down'" (Dkt. 5 at 4), as the prison actually "was 'locked down,'" 621 F.2d at 321.

clients will be at a given facility." *Vu V. L., v. Mullin*, No. 26-CV-2947 (LMP/JFD), 2026 WL 1893611, at *3 (D. Minn. July 1, 2026). These circumstances, which are created by the Government, "no doubt present the sort of 'inaccessibility' and 'lack of time' that justifies an attorney to act on a petitioner's behalf in signing and verifying a habeas petition." *Id.* The Court declines to recommend dismissal because Petitioner's counsel, rather than Petitioner, verified the Petition.

Respondents also contend that counsel's verification of the Petition on Petitioner's behalf has resulted "in two key material misrepresentations," first, "that arrest was done without a warrant or detainer" and second, "that Petitioner was paroled into the United States." (Dkt. 5 at 4 (citing Dkt. 1 ¶¶ 20, 31-45, 47, 55-58).) This contention lacks merit.

As an initial matter, Respondents' characterization of the Petition is not entirely accurate. With respect to the warrant, the Petition alleges:

> [Petitioner] was presented with some paperwork when he was transferred from police to ICE custody. When [Petitioner] reviewed the paperwork that he was given by immigration authorities at the time he was taken into custody, he found a form I-213 Record of Deportability, but a warrant does not appear to be among the paperwork presented to him.

(Dkt. 1 ¶ 20.) It further alleges: "Upon information and belief, Respondents did not present any administrative warrant to [Petitioner] when they detained him, and have not produced one since." (*Id.* ¶ 56; *see also* Dkt. 7 at 6 (reply brief explaining "Petitioner reviewed his paperwork and did not find a warrant among any of the documents in his possession at Freeborn County").) These allegations differ from an allegation (as Respondents claim) that an arrest "was done without a warrant or detainer." (*See* Dkt. 5 at 4.)

It is true that Respondents have filed a copy of a warrant with a certificate of service indicating that it was served on Petitioner on December 26, 2025. (*See* Dkt. 6-4 at 1; Dkt. 6 ¶ 12.) The date of service is the day after ICE "encountered" Petitioner at Polk County Jail on December 25, 2025 and lodged a detainer and an "unserved but signed" warrant with Polk County Jail. (*See* Dkt. 6 ¶¶ 11-13.) None of this suggests that the allegations in the Petition describing what Petitioner found in his paperwork and stating Petitioner did not believe he had been presented with a warrant when he was detained are misrepresentations. As to the allegation in the Petition that Respondents had not "produced [a warrant] since" Petitioner's detention, the record before the Court does not suggest that this allegation misrepresents Petitioner's understanding at the time the Petition was filed, based on his recollection of the events and the documents in his possession. In fact, the Petition appropriately identified this allegation as being "[u]pon information and belief." (*See* Dkt. 1 ¶ 56.) In short, the Petition's allegations relating to a warrant certainly do not constitute a "material misrepresentation," and moreover, Respondents do not explain how requiring Petitioner to verify the Petition himself would have resulted in different allegations.

Respondents also cited the Petition's discussion of the law relating to warrantless arrests at paragraphs 31-45 and 55-58 to support their claim of a "key material misrepresentation" as to the warrant. (*See* Dkt. 5 at 4.) The Court finds no "material misrepresentation" in the Petition's discussion of this law. *See Vu V. L.*, 2026 WL 1893611, at *4 (rejecting the government's argument that the petitioner's "statement that he was arrested without a warrant" was false because "that's not really what the petition

says"). Finally, it is unclear why Respondents claim the Petition alleges that Petitioner's arrest lacked a detainer, as Respondents did not identify any such statement in the Petition, and the Court has found none.

As to the alleged "material misrepresentation" of parole (*see* Dkt. 5 at 4), it is true the Petition was imprecise in its use of the word "parole" to describe the legal circumstances through which Petitioner came to reside in the United States. But the Court finds that the Petition made a good faith attempt to characterize the undisputed facts that Petitioner encountered immigration authorities near the border and was subsequently released by immigration authorities to reside in Iowa, where he awaited an immigration court date scheduled years in the future. (*Compare* Dkt. 1 ¶ 16, *with* Dkt. 9-1 ¶¶ 4-9.) There is no reason to believe that the circumstances of Petitioner's release to his sister in Iowa would have been more accurately described had Petitioner—a non-lawyer—verified the Petition. Further, Respondents had knowledge of the circumstances of Petitioner's release to his sister in Iowa at the outset of this case, and it is troubling that they failed to disclose these circumstances or provide the relevant evidence with their Response, instead waiting until the Court expressly ordered them to do so. (*See* Dkt. 8 at 3 ¶ 1; Dkt. 9 at 1.)

In sum, the Court finds no defect in the verification of the Petition and no material misrepresentations in the Petition (much less any resulting from counsel's verification). Alleging a "material misrepresentation" is a serious matter, and parties that do so should be able to support their allegation with actual misrepresentations that are in fact material, not to mention ensure that their own representations and filings can withstand similar

scrutiny. Here, the Petition adequately set forth the facts and issues and did so in a manner that permitted the Court to rule on the Fourth and Fifth Amendment claims it raised. The Court declines to recommend dismissal on any basis related to verification or purported material misrepresentations.

## IV. RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT** the Petition (Dkt. 1) be **GRANTED** insofar as:

1. Petitioner's current detention, under the particular circumstances presented here and without any meaningful opportunity to obtain an individualized determination regarding the justification for that continued detention, be declared unlawful under the Constitution and laws of the United States.

2. Respondents be ordered to provide Petitioner with an individualized custody hearing in Minnesota no later than seven (7) days after an Order adopting this Report and Recommendation. At that hearing, Respondents may seek Petitioner's continued detention based upon an individualized showing that continued custody is justified by risk of flight or danger to the community.

3. Respondents be ordered to immediately release Petitioner from detention if Respondents do not provide him with an individualized custody hearing as required by such Order.

4. Respondents be ordered to immediately release Petitioner from detention if Respondents take the position in this action or in the immigration proceedings that they are unable to provide Petitioner with a "bond hearing," individualized custody hearing, or

similar proceeding that provides constitutionally required due process because the immigration court lacks jurisdiction, or should Respondents provide a "bond hearing," individualized custody hearing, or similar proceeding that does not provide Petitioner with notice and a meaningful opportunity to be heard on the revocation of his order of recognizance, as well as an opportunity to challenge whether any changed circumstances justified his re-detention and whether his detention is justified by any risk of flight or danger to the community; that deprives Petitioner of his right to counsel, including by not providing Petitioner or counsel with sufficient notice of the hearing; or that is otherwise "illusory," including because the immigration judge believes they lack jurisdiction.

Dated: August 5, 2026

s/ *Elizabeth Cowan Wright*
Elizabeth Cowan Wright
United States Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).